**TCA BUILDING COMPANY**

v.

**NORTHWESTERN RESOURCES CO. et al.**

**Civ. A. No. G–93–265.**

United States District Court, S.D. Texas, Galveston Division.

Jan. 19, 1995.

William Thomas Womble, Womble & Spain, John V. Singleton, Jr., G. Allen Price, Houston, TX, for TCA Bldg. Co.

David J. Beck, Beck Redden & Secrest, Ronald D. Secrest, Beck Redden & Secrest, Don Henry Magee, McGinnis Lochridge & Kilgore, Austin, TX, for Northwestern Resources Corp.

Robert K. Wise, David Preston Poole, Worsham Forsythe Sampels & Wooldridge, Dallas, TX, for Texas Utilities Elec. Co.

Lee L. Kaplan, Baker & Botts, Houston, TX, for Utility Fuels Inc., and Houston Lighting and Power Co.

## ORDER GRANTING SUMMARY JUDGMENT

KENT, District Judge.

This is an antitrust action brought against Defendants Northwestern Resources Company ("NWR") and Houston Lighting & Power Company ("HL & P"), alleging violations of the Sherman Act, 15 U.S.C. §§ 1 & 2. By its earlier Order, this Court dismissed all of Plaintiff TCA Building Company's ("TCA") allegations in this matter, save for the possible antitrust injuries implicit in TCA's allegation that HL & P has effectively refused to purchase TCA's coal and that NWR has refused to provide TCA access to its "essential facilities" for marketing that coal to HL & P. Before the Court now is Defendants' Motion for Summary Judgment on these remaining issues in the case. For the reasons state below, the Court finds that Defendants' Motion is **GRANTED.**

### Background

#### The Jewett Mine

In 1972, the tracts now owned by TCA were purchased by W. Laird Lahrmann and his father, W. Lee Lahrmann, from the Texas Veteran's Land Board ("VLB"), under contracts for deed. These tracts, constituting approximately 107 acres, hold an estimated 2.8 million tons of recoverable lignite. The elder Lahrmann assigned the tracts to his son in 1976. In 1978, the son leased his mineral interests in the tracts to Defendant TUE, for a ten-year primary term.[1] Since the VLB still held an interest in the property, at that time this was the longest primary term permitted by statute. Simultaneously, however, W. Laird also executed documents purporting to grant TUE the option to lease the tracts for an additional 35 years. W. Laird died shortly thereafter, and his interest in the tracts passed back to his father.

In 1982, W. Lee Lahrmann and others sued TUE in the District Court of Freestone County, claiming that the 35-year options were void under the Texas statutes pertaining to mineral leases of VLB land. The state court dismissed the lawsuit in 1985 for want of prosecution.

Meanwhile, HL & P and Northwestern had also been acquiring lignite leases in this area.[2] In 1979, HL & P and Northwestern entered a "Lignite Supply Agreement." This agreement established a lignite "Reserve Area" covering a large contiguous area in Limestone, Leon, and Freestone Counties, including the Lahrmann tracts. Under the agreement, HL & P sub-leased all of its lignite properties within the Reserve Area to Northwestern, agreed to build a lignite-burning generating plant in Limestone County, and agreed to purchase all of this plant's fuel requirements from Northwestern. In return, Northwestern agreed to attempt to acquire enough further reserves in the Reserve Area to supply the plant's expected 240,000,000 ton lignite requirements over its 30-year lifespan; to dedicate all of this reserve to HL & P; and to mine and deliver the lignite to the plant. Additionally, through this and subsequent agreements, HL & P agreed to purchase all of the permanent facilities necessary to mine the reserves, then lease this equipment to Northwestern for a nominal fee. This operation would become known as the Jewett Mine.

In 1986, TUE sold Northwestern a block of leases in the Reserve Area covering approximately 1300 acres, including the leases and options covering the Lahrmann tracts, in exchange for an overriding royalty. Concerned about the possible invalidity of the options on Lahrmann's land, Northwestern sent one of its landmen, Don McLaughlin, to obtain a ratification of these options. By this time, Lahrmann owned the property in fee simple, and it was no longer under VLB restrictions. Lahrmann executed the ratifications in 1987.

Don McLaughlin left Northwestern in April, 1991, knowing that Northwestern planned to prepare Lahrmann's land for mining that year. In September 1991, Lahrmann sold his tracts, plus all claims and causes of action related to them, to Plaintiff TCA Building Company. TCA is owned by a trust

---

1. TUE is an electric utility which operates several lignite-fueled generating stations in Texas.

2. HL & P is an electric utility, and Northwestern is a mining company.

created by Don McLaughlin's brother, Houston attorney Michael McLaughlin.

*The Litigation*

Two months after purchasing the tracts, TCA sued Northwestern in the District Court of Freestone County for a declaration that the leases were void, later adding TUE and HL & P as defendants. TCA claimed that the initial options were void under VLB regulations, and that the subsequent ratifications were void because they were procured through fraud. Northwestern maintained that its leases were valid, and continued preparing the TCA tracts for mining by stripping off the overburden and de-watering the subsurface. In November 1992, TCA informed Northwestern that it would seek more than $50 million in damages if Northwestern mined the tracts under the disputed leases.

Northwestern responded in February 1993 that it would simply bypass the TCA tracts, and not mine the land at all, if TCA did not recognize its right to do so without reservation. Northwestern also informed TCA that:

> In the progression of lignite production, once the production has passed the Lahrmann tract, it will not be economically feasible to move back and produce lignite from the Lahrmann tract. It is estimated that by May 1, 1993, the mining and reclamation operations will have bypassed the Lahrmann tract to the point that it is not economically feasible to produce lignite from the Lahrmann tract.

TCA balked, and Northwestern did, in fact, mine around the TCA tracts.

Despite its extant demand in the state court suit that Northwestern vacate its land, TCA then amended its petition to include the bypass decision as part of its allegation of fraud. TCA also filed this action, alleging that the actions of the Defendants violated federal antitrust laws.

In December 1993, Northwestern unilaterally released its interest in these tracts to TCA.

Trial on the state court action commenced on January 31, 1994. At trial, TCA complained that the release was inadequate; Northwestern then filed a supplemental release to meet these complaints. After three weeks of evidence, the jury returned a verdict against TCA. Although the court had previously ruled that the initial 35–year options had been void when executed, the jury found that Northwestern had not obtained the ratifications by fraud. The jury also found that TCA was estopped to assert its claims, and that Northwestern's decision to mine around the TCA Tracts did not diminish the value of the lignite on TCA's land. Accordingly, the state court entered a take-nothing judgment against TCA on March 11, 1994.

*Standard of Review*

*General*

■■■ Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. A genuine issue of material fact exists if there is a genuine issue for trial that must be decided by the trier of fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In other words, summary judgment should not be granted if the evidence indicates that a reasonable fact-finder could find in favor of the nonmoving party. *Id. See also Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

■■■ In ruling on a Motion for Summary Judgment, the Court must accept the evidence of the nonmoving party and draw all justifiable inferences in his favor. Credibility determinations, the weighing of the evidence, and the drawing of reasonable inferences are left to the trier of fact. *Anderson v. Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. at 2513.

■■■ Under Fed.R.Civ.P. 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once this burden is met, the burden shifts to the nonmoving party to establish the exis-

tence of a genuine issue for trial. *Matsushita, supra,* 475 U.S. at 585–87, 106 S.Ct. at 1355–56; *Leonard v. Dixie Well Serv. & Supply, Inc.,* 828 F.2d 291, 294 (5th Cir. 1987).

■ Where the moving party has met its Rule 56(c) burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no *genuine issue for trial.*" *Matsushita, supra,* 475 U.S. at 586–87, 106 S.Ct. at 1356 (quoting Fed.R.Civ.P. 56(e)).

■ Summary judgment is appropriate in antitrust actions. *In re Municipal Bond Reporting Antitrust Litigation,* 672 F.2d 436, 440 (5th Cir.1982). To succeed in the claim of monopolization, a Plaintiff must demonstrate that the Defendants have achieved a monopoly or that there is a dangerous probability that such a monopoly will be established. *Id.* (quoting *Yoder Bros. Inc. v. California–Florida Plant Corp.,* 537 F.2d 1347, 1366–69 (5th Cir.1976), *cert. denied,* 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977). The Plaintiff bears at all times the burden of proving the relevant geographic and product markets involved in the suit. *Satellite Television & Associated Resources, Inc. v. Continental Cablevision of Virginia, Inc.,* 714 F.2d 351, 355 (4th Cir.1983), *cert. denied,* 465 U.S. 1027, 104 S.Ct. 1285, 79 L.Ed.2d 688 (1984).

### Analysis

1. *The Relevant Geographic Market*

■ As stated above, the Plaintiff in an antitrust case bears the burden of proving the relevant market its product competes in, "because the concept of competition has no meaning outside its own arena, however broadly that arena is defined." *Satellite Television,* 714 F.2d at 355. This market definition consists of showing both the relevant geographic market and the relevant product market. *Id.* This Court stated in its former Summary Judgment Order in the above-captioned action that defining the market was crucial in this case: if the Defendants' arrangement operates within a geographic market large enough to prevent a restraint on trade, Plaintiff has no Sherman Act claim. (See Order on Motion for Summary Judgment, at 38). Such a finding would dispose of both of the Plaintiff's remaining two allegations in this case. The Court now finds that Plaintiff has not borne its burden of proof on this matter and that the relevant geographic market precludes TCA's allegation that Defendants' Lignite Supply Agreement ("LSA") imposes a restraint on trade.

Fundamental to Plaintiff TCA's antitrust claims is the assumption that the market for its lignite is confined to the Jewett Mine area itself, a region tightly drawn around the parties involved in this case. As a potential miner of lignite, TCA claims that it has been excluded from the relevant market for its product by the exclusive dealings contract between NWR and HL & P because it is confined to the Limestone Plant, which is the subject of the Defendants' LSA.

On the other hand, Defendants argue that the relevant geographic market for TCA's lignite includes a larger area—a radius of 100 miles, within which TCA's own expert identified at least five lignite generating stations. (See Defendants' Motion for Summary Judgment, at 10; Defendants' Exhibit K, at 6). These plants include:

| Station | Operator | Distance |
|---|---|---|
| Limestone | HL & P | 7 miles |
| Big Brown | Texas Utilities | 30 miles |
| Gibbons Creek | TMPA | 90 miles |
| Texas–New Mexico Power | TNP | 50 miles |
| Sandow | TU/Alcoa | 105 miles |

(Defendants' Exhibit K, at 7). In addition, TCA reaffirmed its support of its expert's report by using it to identify those facilities for which TCA contends lignite mined from its tracts could be purchased as a fuel source. (See Defendants' Exhibit B, at 14). Based on this showing of several lignite plants located within relatively short distances from the parties, the Court finds that Defendants have born their Summary Judgment burden of showing why no genuine issue of material fact exists and has thereby shifted the burden to TCA to demonstrate why there is a material question in this case.

In response, TCA has claimed that lignite from its mines cannot be transported beyond the Jewett Mine area because "due to its particular characteristics, [it] cannot be affordably transported significant distances in the manner of other fossil fuels." (Plaintiff's Response, at 7). As authority for this utterly conclusory statement, Plaintiff points (without specificity) to two affidavits of Paul Epley and James Francis. Unfortunately for Plaintiff, neither of these affidavits, which the Court has read with care, factually support this claim. The Francis affidavit neither mentions what characteristics of lignite make it untransportable nor states what costs TCA would bear if it were to transport its lignite to one of the four potential purchasers its own expert identified. Instead, Francis merely states that "lignites outside the Jewett Mine area are not competitive at the Limestone Station." (See Plaintiff's Exhibit 2, at 7). The relevant question, however, is not the competitive nature of lignite from outside the Jewett Mine at the Limestone Station, but rather the competitive nature of the Jewett Mine lignite at stations outside the area.

██ Nevertheless, even if the Court reads Francis' comment with the utmost liberality, it is insufficient to establish that a genuine issue of material fact exists on this point. First, the Court notes that Francis' statement depends on an additional comment in the affidavit designed to demonstrate that lignite mined outside the Jewett Mine area is not competitive with lignite mined within the Jewett confines. Francis states: "I am aware of an internal study by NWR that found that lignites adjacent to the Jewett reserves but on the east side of Interstate 45 and lignites located at Teague, Texas [sic] north of the Jewett mine area, even with the possibility of rail delivery to the Plant, were not price competitive with even deep lignites at Jewett." (Id. at 7). This comment, however, is clearly inadmissible as a textbook example of hearsay: TCA clearly wishes to rely on this statement for the truth of the proposition asserted, i.e. that shipped lignite is not competitive with non-shipped fuel. The Court, therefore, will not consider Francis' statement as valid summary judgment evidence.

In addition, Francis also states that "the transportation costs to the Twin Oak plant would make delivery of TCA's lignite prohibitive." (Id. at 15). Once again, this statement has nothing to do with Plaintiff's assertion in its Response that lignite cannot be transported because its unique *characteristics* make it uneconomical to transport it, nor does it state what the basis of comparison is to the transport costs involved with "other fossil fuels."

██ More importantly, however, Francis' statement is an inadmissible conclusory statement inappropriate for summary judgment purposes. It is an elementary principle that such conclusory statements are not sufficient to raise a genuine issue of fact in a summary judgment deliberation; a Plaintiff opposing summary judgment *must* give some specific, affirmative indication that its version of the relevant issues is grounded in fact. *See, e.g., Lechuga v. Southern Pacific Transportation Co.*, 949 F.2d 790, 798 (5th Cir.1992) ("Conclusory statements in an affidavit do not provide facts that will counter summary judgment evidence."); *Hadley v. County of Du Page*, 715 F.2d 1238, 1243 (7th Cir.1983), *cert. denied*, 465 U.S. 1006, 104 S.Ct. 1000, 79 L.Ed.2d 232 (1984) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, [sic] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.").

The Court believes that the affidavit statements in this case should be viewed in light of the Fifth Circuit's ruling in *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869 (5th Cir.1978). That case involved the question of whether the Defendant fell within the minimum wage requirements of the Fair Labor Standards Act. Tracking the language of the statute, Defendant filed affidavits alleging: (1) its gross income ranged between $188,227 and $160,895; (2) over 50% of its sales volume occurred in Georgia; (3) at least three-fourths of its dollar volume was collected from purchasers who did not resell the services; and (4) at least three-fourths of its services were sold to the public at large. The Court noted that the last three points were wholly conclusory—and therefore ordinarily inappropriate for summary judgment purposes—but that they were of such an "obvious nature" as to be admissible. *Id.* at 872. In response, the non-moving Plaintiff filed opposing affidavits stating that, based on personal knowledge, "a certain portion of Defendants' guests ... stayed at the motel on arrangements of longer than normal day-at-the-time," thus bringing Defendant within the minimum wage requirements. *Id.* The Court granted summary judgment for the Defendant based on Plaintiff's conclusory assertion, which failed to specifically assert factual matters that could have been revealed through ordinary discovery. *Id.* at 873.

In this case, too, Plaintiff has failed to assert specific factual matters in rebuttal of Defendants' summary judgment evidence.[3] Mere conclusions such as "lignites outside the Jewett Mine area are not competitive at the Limestone Station" or "the transportation costs to the Twin Oak plant would make delivery of TCA's lignite prohibitive"[4] (Plaintiff's Exhibit 2, at 7, 15) do not meet Plaintiff's burden for summary judgment or its threshold burden of showing the relevant geographic market.[5] As Fed.R.Civ.P. 56(e) clearly states, "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits and as otherwise provided in this rule, *must set forth specific facts* showing that there is a genuine issue for trial" (emphasis supplied).

Nor does the second piece of evidence Plaintiff points to in its Response (again without specificity)—Epley's affidavit—provide specific evidence for Plaintiff's conclusion. In fact, the only comment even remotely approaching the claim made by the Plaintiff is Epley's statement that there is an "inability to economically transport lignite over any appreciable distance." (Plaintiff's Exhibit 3, at 3). This statement suffers from two fatal flaws. First, like Francis' statements analyzed above, Epley's comment is wholly conclusory, and this Court will not consider such unfounded testimony in its consideration of this case. In addition, even if the Court takes Epley's bald assertions as being factually supported, the claim that lignite cannot be transported over "any appreciable distance" fails to specify what kind of range is at stake here: 10 miles? 50 miles? 1000 miles? Such a determination is crucial to Plaintiff's claim, and Epley (who is highly experienced in the mining field) could easily have stated the distance he meant. The Court cannot, and will not, create parameters

---

3. Unlike the Defendant's "obvious" conclusory statements in *Gossett*, Plaintiff in this case makes conclusory statements that are far from obvious. Indeed, they go to the very heart of Plaintiff's burden of showing the relevant geographic market for its lignite.

4. The latter statement depends on Francis' earlier comment concerning the internal study of NWR, which the Court has ruled to be inadmissible hearsay. Thus, no factual support is present for the conclusion asserted in Francis' comment.

5. The Court notes that Plaintiff's Response later points to a report of one of *Defendants'* witnesses, which states that "there are economic limits to how far [lignite] can be transported." (Defendants' Exhibit L, at 13). However, Plaintiff can hardly use this as a basis for defining the geographic market (indeed, TCA does *not* use this statement in its formal argument for the relevant market) because it suffers from the same flaw as Epley's comment: it simply does not define what the economic limits for transportation are. Defendants' witness also states that "[t]he rail network in Texas provides easy rail access to many powerplant sites" and that "[o]ff-site lignite has been consumed by powerplants in Texas and Louisiana." (Defendants' Exhibit L, at 14).

for the meaning of "appreciable" in this context.

Plaintiff's Response also asserts that TCA cannot economically transport its lignite outside the Jewett Mine area because lignite power plants are "banded" to a specific lignite and are designed to burn most efficiently when using lignite with a particular characteristic. (Plaintiff's Response, at 7). While this may indeed be true, TCA's Response utterly fails to direct the Court's attention to a single factual basis for this conclusion in the four large volumes of affidavits and materials it submitted for summary judgment purposes. Moreover, even if the Court assumes the truth of this bald assertion, Plaintiff's Response has *not* argued that the characteristics of its own lignite make it inappropriate for consumption at the four lignite plants surrounding the Jewett Mine area.

Finally, TCA argues that access to a lignite-purchasing plant is sometimes unavailable unless the seller has access through specific handling facilities, concluding that "[t]his is the situation at the Limestone Plant." (Plaintiff's Response, at 7). Once again, however, the relevant question in this matter is not what conditions obtain at the Limestone Plant, but what access conditions are present at the remaining four plants that are potential buyers of TCA's lignite. Plaintiff does not even facially argue in its Response that "special handling facilities" are

present at these other stations or that, if they are, they pose substantial barriers to TCA's access to those plants.

Thus, the Court can find no competent summary judgment evidence with which to decide that, once the Defendants have shifted the burden of proof, Plaintiff has born its burden of demonstrating that a genuine issue of material fact exists in this matter or that Plaintiff has borne its burden of demonstrating the relevant geographic market at stake in this case. The Court therefore concludes that the relevant geographic market for TCA's lignite is the area encompassing the four lignite-purchasing plants outside the Jewett Mine area and that the Plaintiff has failed to demonstrate that the LSA between HL & P and NWR has substantially lessened competition for lignite within this market.[6]

### 2. The Exclusive Dealing Claim

Although the Court finds that Plaintiff has failed to meet the threshold requirement of demonstrating the existence of a relevant market, the Court also finds that, even if such a market is assumed, Plaintiff's exclusive dealing claim still fails. Exclusive dealings contracts are subject to scrutiny under § 1 of the Sherman Act and are analyzed under the Rule of Reason. *Jefferson Parish Hospital v. Hyde*, 466 U.S. 2, 44, 104 S.Ct. 1551, 1575, 80 L.Ed.2d 2 (1984).[7]

**6.** In deciding this issue, the Court has assumed, without deciding, that the relevant *product* market is lignite. Defendants vigorously argue that this product market should be expanded to include alternative fuels such as gas and other forms of coal. Nevertheless, TCA has presented ample evidence indicating that plants are designed to burn a specific kind of fuel and that conversion from one form to another can impose significant costs. The Court is mindful that the Fifth Circuit has defined the relevant product market as being "composed of products that have reasonable interchangeability for the purposes for which they were produced" and that "[t]he outer boundaries of the product market are drawn in terms of the presence of substitutes to which consumers will turn in response to price changes (cross-elasticity of demand), [sic] and the ability of other existing producers or new entrants to expand output from their present facilities or to build new capacity (elasticity of supply)." *Hornsby Oil Co., Inc. v. Champion Spark Plug Co.*, 714 F.2d 1384, 1393 (5th Cir. 1983). If, in fact, conversion from lignite to

alternative fuels is economically prohibitive, the Court doubts that significant cross-elasticity of demand exists within the geographic market Defendants describe.

Nevertheless, the Court need not decide the relevant product market. The "relevant market" for antitrust purposes includes *both* the geographic and product markets, and having found that Plaintiff has failed to bear its burden on the former issue, the Court concludes that TCA has failed to demonstrate the "relevant market" as a whole. *See, Southern Business Communications, Inc. v. Matsushita Elec. Corp. of America*, 806 F.Supp. 950 (N.D.Ga.1992) (stating that the relevant market for a restraint of trade action must include both the relevant geographic and the relevant product market).

**7.** The Rule of Reason was originally formulated by Justice Brandeis:

The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether

This Rule focuses on the competitive implications of such an agreement and is measured by the facts peculiar to the business, the history of the restraint, the reasons it was imposed, and the actual impact it has on competition. *Hornsby Oil Co.,* 714 F.2d at 1392.

The Court notes that the LSA in this case serves legitimate business and public-interest goals. The LSA requirements contract assures HL & P, which supplies power to one of the country's most populous areas, an adequate and reliable supply of lignite for the life of the Limestone Plant. The Supreme Court has recognized this goal:

> [A]t least in the case of public utilities [sic] the assurance of a steady and ample supply of fuel is necessary in the public interest. Otherwise consumers are left unprotected against service failures owing to shutdowns; and increasingly unjustified costs might result in more burdensome rate structures.... The compelling validity of such considerations has been recognized fully....

*Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 334, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). The LSA protects HL & P against increases in fuel market prices and reduces the administrative and operational difficulties that arise in employing multiple miners.[8] Indeed, all but one lignite-powered plant in Texas have a dedicated mine and a single miner. (See Defendants' Exhibit L, at 11, 13; Defendants' Exhibit K, at 3). As a result, HL & P benefits from the economies of scale of NWR's operation. (See Defendants' Exhibit A, at 2).

> it is such as may suppress or even destroy competition. To determine that question [sic] the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation, or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.
>
> *Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918).

It is also undisputed in this case that HL & P has, in fact, offered to deal with TCA. The TCA tracts lie within the LSA reserve area and are surrounded by other properties leased to NWR. Under the TCA lease, NWR began preparing TCA's land for mining in 1992 by removing the top soil on TCA's tracts. Nevertheless, TCA claimed that NWR had obtained the leases by fraud and sued NWR in state court. NWR consequently informed TCA that it would mine around TCA's tracts.

In October 1993, TCA offered to sell its lignite to HL & P for $12 per ton. HL & P accepted the offer subject to a supply agreement. In addition, NWR has *waived* its LSA contractual right to exclusively supply lignite to the Limestone Plant and has *released* its own right to mine the TCA property, thereby allowing TCA to function as both a miner and a supplier of lignite. (See Defendants' Exhibit I). NWR also agreed to provide TCA with a means of ingress and egress to TCA's tracts, see id., and has offered to construct a haul road at NWR's own expense to allow access to the Limestone Plant.

TCA, however, has refused these offers from Defendants despite the fact that HL & P has reduced its performance bond requirement from over $6,000,000 to $1,247,000. (See Defendants' Exhibit F).[9] This bonding requirement is based on costs HL & P would incur in replacing a one month's supply of lignite (120,000 tons) if TCA were to default on its obligation to deliver. In addition, HL & P agreed not to charge TCA for TCA's

8. In a sense, TCA itself admits this:

> In order to operate efficiently, and profitably, that is to say to benefit both ratepayers and investors, electric generating utilities relying on fossil fuels as an energy source must have secure fuel supplies and supply sources to insure continuous production capacity.... In turn, the more secure the fossil fuel supply—the more efficient the generating plant.
>
> (Plaintiff's Amended Complaint, at 4).

9. HL & P has also agreed to accept a corporate guarantee from TCA's mining contractor if the contractor is of sufficient size. Id.

share of the capital costs associated with using the haul roads or the water detention and treatment facilities. (Id.). TCA has refused all such terms. (See Defendants' Exhibit H).

Thus, neither Defendant has used the LSA to exclude TCA from mining or supplying its lignite reserves to HL & P. Nor does the LSA prevent TCA or any other lignite owner from supplying its lignite to other lignite plants in the region. Limestone's consumption represents only 33% of the consumption in the five-plant area described above, leaving TCA with almost 70% of the lignite market open to it. TCA's lignite reserves represent only 1% of the Limestone Plant's lifetime requirements, and the Court seriously doubts that excluding TCA or any landowner will appreciably affect output or price. As stated earlier, HL & P is a public utility which must act prudently in guaranteeing that it has a reliable source of lignite for its operations.

### 3. The Essential Facilities Claim

The second issue this Court permitted to survive the earlier summary judgment in this case is Plaintiff's claim that Defendants have violated the Sherman Act by denying it access to facilities essential to its participation in the lignite market. The essential facilities doctrine (or "bottleneck theory") is a recent addition to antitrust jurisprudence. *See Flip Side Productions v. Jam Productions, Inc.,* 843 F.2d 1024, 1032 (7th Cir.), *cert. denied,* 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988). The Seventh Circuit has been particularly active in defining the requirements for this doctrine and has established a four-part test this Court finds useful as a guideline in analyzing an essential facilities claim. This test includes: "(1) control of the essential facility by a monopolist; (2) the competitor's inability practically or reasonably to duplicate the essential facility; (3) denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." *MCI Communica-*

*tions v. American Tel. & Tel. Co.,* 708 F.2d 1081, 1133 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). An essential facility need not be indispensable, but its denial must impose a severe handicap on potential market entrants. *Hecht v. Pro-Football, Inc.,* 570 F.2d 982, 992 (D.C.Cir.1977), *cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978).[10]

In this case, TCA alleges that it has been effectively denied the Jewett Mine haul roads on which NWR's mining vehicles travel and which Defendants funded and constructed. In response, Defendants argue that a reasonable alternative to using NWR's roads exists. HL & P has agreed to accept TCA's lignite at its stockpile at the Limestone Plant, (Defendants' Exhibit H, at 121), and NWR has agreed to construct a roadway *at its own cost* from the TCA tracts, across NWR's property, to Highway 164. (Defendants' Exhibit R, at s. 15). TCA's trucks would then be able to travel along several public highways (Highway 164; FM 39; FM 152) to the Limestone Plant. The Court agrees with Defendants' claims.

TCA alleges that this is not a reasonable alternative because using the public roads is impracticable. Yet the evidence clearly shows that Highway 164 and FM 39 have load limits of 80,000 pounds; if TCA uses 20–ton trucks, as the evidence shows is entirely possible in this case (Defendants' Exhibit S, at s. 7; Exhibit P, at 168), TCA will be amply able to transport its lignite to the Limestone Plant.

TCA objects that FM 80 and FM 1512 have load limits of only 58,420 pounds. Yet the uncontroverted evidence in this case clearly shows that this poses no bar to TCA's successful transportation of its lignite. First, it is clear that TCA would be able to get a special permit from the Texas Department of Transportation for $75 per vehicle, plus a *single* bond of $15,000 per year to compensate for any harm to the roads that might be caused by the excess load amounts. (See

---

10. Cf. Phillip A. Areeda & Herbert Hovenkamp, Antitrust Law s. 736.2b, at 864 (Supp.1993):

A successful "essential facilities" plaintiff must prove that denial of access has caused it a severe handicap.... As the word "essential"

indicates, a plaintiff must show more than inconvenience, or even some economic loss; he must show that an alternative to the facility is not feasible.

Defendants' Exhibit J). The Court finds the burdens imposed by these regulatory rules to be minimal at best given the scope of the operation TCA proposes and the potential profits it will involve.

TCA vigorously alleges that this scheme is not economically feasible because it will be required to reconstruct the lower-load roads if any damage occurs to them.[11] The Court finds nothing in the record to support this claim. Defendants have presented the testimony of Doris Perkins, a Unit Manager with the Texas Department of Transportation, clearly stating that "[i]f a vehicle falls within the load limit of a roadway, no fee is charged, and if it does not, but it obtains a permit, *no fee in addition to the permit fee and surety bond is charged.*" (Defendants' Exhibit J, at 2 (emphasis supplied)). The Court cannot imagine a clearer and more precise statement indicating that, once a permit is obtained to use the lower-load roads, Plaintiff will not be subject to further fines.

TCA has responded to this testimony with an affidavit of Mr. Burtis Dockery, also of the Department of Transportation, stating that damage is likely to occur to FM 80 and FM 1512 and giving estimates of repair costs for them. (Plaintiff's Exhibit 7). Yet nowhere in his brief statement does Dockery ever claim that *Plaintiff* will be required to pay for this damage. Dockery claims that funds will have to expended to *upgrade* these roads to withstand the excess load amounts before transport begins, but he states neither that the Plaintiff will have to pay this amount upfront nor that Plaintiff will be required to pay for their repair once the damage has been incurred. Indeed, Dockery never addresses the issue of *repair* at all. The Court finds, therefore, that Ms. Perkins' affidavit is uncontroverted and that, as a matter of law, a reasonable alternative exists to the use of NWR's own transport roads. Thus, the Court need not address the question of whether or not the Jewett Mine haul roads are themselves essential facilities in this case.

In addition, the Court finds that the downstream handling facilities at the Limestone Plant are not feasible for shared use and can be duplicated. Defendants point out that the equipment in question is readily available on the market, and that sharing the Defendants' existing downstream handling facilities is impractical because it would be impossible to alter the system for dropping, weighing, and supplying TCA's coal to HL & P as distinct from NWR's. Plaintiff's own expert, Mr. Francis, has stated that this equipment is readily leased and that TCA has already begun exploring the possibility of acquiring it. (See Defendants' Exhibit P, at 158–60). In response, Plaintiff has not even alleged that acquiring such equipment is not economically feasible, nor has Plaintiff presented *any* argument at all on the issue of infeasability. The Court therefore finds as a matter of law that Defendants' downstream handling facilities are not essential and that Defendants' use of them does not violate antitrust law.

Finally, TCA alleges that it must be permitted to discharge its water onto NWR's property. NWR has agreed that, as part of its construction of a haul road for TCA between TCA's tracts and Highway 164, NWR will grant TCA a right-of-way along that road on which TCA may pipe its water discharge. (See Defendants' Motion, at 30). In addition, NWR has presented evidence showing that its water discharge is controlled by the Texas Railroad Commission, whose permit does not cover discharges from other mining operations. (See Defendants' Exhibit T). NWR has also built sedimentation ponds to treat all water flows onto NWR's property; if any pollutants are injected into these detention ponds by TCA, however inadvertently, NWR will be liable criminally and civilly. (See id.). In response, Plaintiff does not even present a facial argument to rebut this evidence (see Plaintiff's Response, at 26–27); indeed, TCA's corporate representative has testified that the right-of-way NWR has offered "would go a long way in allaying the problem" TCA claims is essential. (See De-

---

11. The Court notes with a mixture of regret and amusement in this tortured case that the parties actually present arguments to this Court over whether or not Mr. Francis' dog ate all, part, or none of his notes on this issue. (See Defendants' Motion, at 25 n. 18). The Court hardly believes it to be necessary to inform the parties that the conduct of an affiant's pet has no relevance to the Court's determination of the legal issues in this case.

fendants' Exhibit H, at 124). Given the inability of TCA to mount even a pro forma argument on this point, the Court finds that discharging water on NWR's land is not essential in this case.

### Conclusion

For all of the reasons stated above, the Court finds that Plaintiff TCA cannot recover against Defendants on the remaining antitrust claims of "exclusive dealing" or "essential facilities." Defendants' Motion for Summary Judgment is therefore **GRANTED,** and this entire action is **DISMISSED WITH PREJUDICE.** All relief not specifically granted herein is **DENIED.** All parties are to bear their own costs. It is further **ORDERED** that the parties file no further pleadings on this issue in this Court, including motions to reconsider and the like. Instead, the parties are instructed to seek any further relief to which they feel themselves entitled in the United States Court of Appeals for the Fifth Circuit, as may be appropriate in due course.

**IT IS SO ORDERED.**

**DONE.**